FILED
2004 Dec-27  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **JAMES HUBBARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: CV-03-PT-1587-M** |
| | ) | |
| **M & H VALVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant M&H Valve Company's ("M&H Valve")

Motion for Summary Judgment, filed on April 21, 2004, and defendant's Motion to Strike, filed on

June 15, 2004.

**FACTS[1] & PROCEDURAL HISTORY**

M&H Valve manufactures and sells valves and hydrants for commercial use.  Hubbard, an

African-American man, was hired by M&H Valve in 1972 as a chipper/grinder in the cleaning room.

During his employment with M&H Valve, plaintiff has worked in several other positions, including

chipper, belt operator, transport operator, roller blast operator, stand grinder,[2] RSGV assembler, core

---

[1] The court notes where "facts" appear disputed.

[2] These first four jobs were in the cleaning room.  Plaintiff was transferred to the foundry
sometime in the mid-1980's, where he performed the RSGV assembler, core box changer and
core machine operator jobs.  Plaintiff worked in the foundry until July 2003, when he
successfully bid into the "B through G machine operator" position in the machine shop.  Plaintiff
held this position when he was deposed in January 2004.

1

box changer, and core machine operator.  In the 1980's, Hubbard moved into the foundry department, where he worked until July 2003.  In the foundry, he worked on convention cores, operated a tow motor, worked on tachone cleanup, was employed on the RSGB assembly line, and served as both a core machine operator and a core box changer.  While in the foundry, Hubbard performed a four-year apprenticeship as a journeyman coremaker in the core room.

Between 1993 and 1999, plaintiff held a leadman designation when he worked as a core machine operator on the third shift.  While serving as a leadman, Hubbard performed leadman duties on all three shifts.  A leadman at M&H Valve earns $1.00 per hour more than the regular wage rate for that particular job.

Plaintiff's leadman designation was removed on March 15, 1999.  At that time, a supervisor was placed on the third shift, and M&H Valve explained to Hubbard that it "didn't need a lead man and a supervisor working the same shift."  However, plaintiff asserts, M&H Valve made Michael Smith ("Smith") a leadman and let him work side by side with two supervisors.[3]  While Hubbard believed that his 1999 removal as a leadman was motivated by race, he did not file an EEOC charge at that time.  Hubbard has conceded that John Shaw, a white employee on the Laempe machine, had his leadman designation taken at the same time plaintiff's designation was taken.  No employee in the core room was made a leadman on third shift after that designation was removed from plaintiff.  In November 2000, Hubbard was employed as a core machine operator.  In July 2003, Hubbard

_____

[3] However, this court notes, the cited pages of Douglas Martin's ("Martin") deposition do not clearly correspond to this alleged fact.  Martin is the Foundry Manager at M&H Valve who participated in the decision to award the leadman designation to Michael Tony Smith ("Smith") at issue in this case.

Facts regarding Smith's designation as leadman in 2000 are discussed *infra*.

2

successfully bid into the position of B through G operator in the machine shop.

Throughout his employment at M&H Valve, Hubbard has been an hourly bargaining unit employee. However, plaintiff testified, Ron Dowell ("Dowell"), a white supervisor at M&H Valve, offered him a supervisory position in 1997. Hubbard declined Dowell's offer based on Hubbard's belief that he would earn less money as a supervisor than as an hourly employee in the core room.

Throughout his employment at M&H Valve, Hubbard has worked on a variety of shifts, including first shift (part of 1995, 1996, and part of 1997), second shift (various times from 1995 to the present), and third shift (his regular shift). According to defendant, plaintiff testified to a preference for the third shift because third shift pays an additional $.22 per hour.[4] In 1999, Hubbard filed a grievance after being moved from the third shift to the first shift.[5]

Under Article 1 of the collective bargaining agreement between defendant and its union employees, dated October 9, 1999, the company has the sole right to designate an hourly employee

---

[4] In this regard, Hubbard alleges: "Mr. Hubbard does not have a preference to work third shift except to the extent that it pays more. He has never said that his preference was the third shift. The reason that he works the third shift is because of the 22 cent per hour incentive pay that M&H pays for third shift work."

[5] In the arbitration proceeding arising from this grievance, plaintiff testified:

Q: Are you saying that . . . in December of '98, you worked thirteen days on first shift, right?
A: Yes.
Q: You didn't like it?
A: No.

Similarly, Wayne Gill ("Gill"), the core room supervisor, testified that he believed plaintiff preferred third shift. According to Martin, Hubbard was "adamant about not wanting to work the day shift."

3

as a "leadman."  According to Roger Baldwin's ("Baldwin") declaration,[6] M&H Valve does not have

a set number of leadman positions or require any particular position to have a leadman.  Under the

current collective bargaining agreement, leadmen receive an additional $1.00 per hour above the

contractually determined wage for their respective positions.[7]

M&H Valve had no written or unwritten policies or procedures for selecting leadmen in

2000.  According to Martin, M&H Valve would select a man for a leadman position based on that

particular individual's ability and proximity to the job[8] as well as the need for a leadman.  M&H

Valve does not utilize or perform formal written evaluations on its manufacturing employees.  An

employee's production is recorded on a daily production report, which contains the employee's

name, clock number, job, expected rate, and produced rate.  There is no formal policy or procedure

at M&H Valve to evaluate the production report and to grade an employee.  Martin testified to

looking at the production report on a daily basis.  If an employee has a superior production

performance, Martin testified, M&H Valve does not utilize that fact other than giving the employee

a "pat on the back."  Baldwin confirmed that M&H Valve does not have written criteria for filling

leadmen positions and that leadman jobs are not bid.  According to defendant, M&H did not post

openings for leadmen positions prior to October 2002.  Wayne Gill, Smith's supervisor, further

---

[6] Baldwin is M&H Valve's Personnel Manager and is Caucasian.

[7] In Hubbard's deposition, he agreed that if he had been given the leadman Laempe
operator designation on the first shift, he would only have received a $.78 per hour raise because
he would have lost the $.22 per shift differential he received for working on third shift.

[8] According to Martin, "proximity to the job" meant that an employee was familiar with
the particular machine upon which that employee was to train other employees.  Specifically,
Martin defined it as follows: "If I'm expecting an increase in foundry production and I will need
training on a particular machine, by proximity I mean the person that's already running the
machine."

4

confirmed that there are no written criteria used by M&H to select an employee for supervisory positions.

The labor agreement in effect in November 2000, between M&H Valve and The Glass, Molders, Pottery, Plastics and Allied Workers International Union contains the only job description for the position of leadman at M&H Valve. A leadman instructs new employees, assigns work, gives attention to required materials, sets up machine(s) and assists in maintaining quality and production requirements.

In November 2000, Smith, who is Caucasian, was a Laempe machine operator on the first shift at M&H Valve. Smith was hired by M&H Valve on June 9, 1999. Martin does not know if Smith had been trained on the coremaking machine before he became an operator. Smith's employment application confirms that the only special skills he had at the time of his employment in 1999 were those of a forklift operator. Smith's past work experience included two years as a clean-up person and approximately five years as an oil/tire changer in the automotive service industry. Hubbard states that Smith was a tire changer at a tire shop before his employment with defendant; Hubbard buys his tires at that shop.

Gill, the Core Room Supervisor on the first shift, supervised Smith. Gill testified that the policy and procedure for M&H Valve for selecting leadmen has not changed since November 2000. Gill stated that Smith was the best Laempe operator at M&H Valve during Gill's tenure with the company. *See* Gill Decl. According to Gill, Smith produced cores on the Laempe machine at a high rate and even experimented with the processes on the machine in order to increase core production and to reduce the amount of machine downtime. Gill stated that Smith's efforts in attaining high production levels and increasing the overall productivity of the machine were even more remarkable

considering the fact that Smith did not receive incentive pay based on his production rate.

Gill testified that because of Smith's excellent job performance and the hope that Smith could pass on his knowledge of the machine to other employees, Gill recommended to Martin (Gill's superior) that Smith be given a leadman designation.[9]  Prior to Smith being given the leadman title, no Laempe machine operator had been designated a leadman since March 1999.  When Smith resigned from the company in November 2001, no other Laempe operator was given the leadman designation.

Gill testified that his recommendation about Smith was unsolicited:

> Q:  Did you know that there was going to be a need for a leadman position ahead of time, or did somebody tell you to select somebody for a leadman?
> A:  No.  Nobody told me.
> Q:  So, did you just decide based on what you were seeing Mr. Smith do that he should be a leadman?
> A:  Yes.

On November 27, 2000, Gill's recommendation was approved, and Smith became the first shift leadman on the Laempe machine, thereby receiving a $1.00 per hour raise.  According to Gill, although Smith was designated as a leadman, Smith's primary role remained his duties as a Laempe operator.  Because Smith already worked on the first shift and because Gill and Martin preferred that the leadman train employees on that shift,[10] Gill stated, it was not necessary to change Smith's shift.

---

[9] Gill testified: "I wanted Michael to be able to train– if we hired any new employees, I wanted him to be the one to train them because of what I stated, his abilities, and I also wanted him to pass along any knowledge that he had on this machine to the other two shifts so that we could improve their productivity just like Michael had improved his."

[10] According to Martin, he approved Gill's recommendation of Smith in part based on his belief that M&H Valve would need to train employees on the Laempe machine and that Smith had demonstrated the communication skills necessary to conduct such training.  Martin testified that Smith ultimately trained three or four employees on the Laempe machine during his one-year tenure as leadman on that machine.  Martin also testified that Smith's proficiency on the Laempe

In recommending Smith as a leadman, Gill allegedly did not believe that it was necessary to consider other employees for this designation as it was not required that the Laempe machine have a leadman.  Even if he had believed it was necessary to have a leadman on the Laempe machine, Gill stated, he would have considered the other only two employees who operated that machine on the second and third shifts.  For M&H Valve to have named an employee as leadman on the Laempe machine in November 2000 other than one of its current Laempe operators, Gill declared, M&H Valve would have been required to displace one of the current Laempe operators, as no vacancies on that machine existed at that time.

Martin testified that the only reason he didn't consider Hubbard for the leadman designation in November 2000 was that Hubbard didn't want to work the first shift.  Martin's testimony was as follows: "*Q: I think you said earlier in your testimony – I want to make sure we are absolutely clear – at the time the decision was made to make Michael Smith a lead man, you didn't consider James Hubbard, is that correct?*  A: For one reason only.  *Q: What was that?*  A: Because he said he did not want to come to day shift.*"

Hubbard testified that he wanted to be given the first shift leadman designation given to Smith on November 27, 2000.  He attributes his failure to receive that designation to racial discrimination.  According to Martin, Hubbard was not considered for that position at all.  Martin was not aware that Hubbard had been trained to operate the machine over which Smith was promoted to leadman.  At the time Smith was promoted, Martin stated, he did not have any reason to believe that Smith was better trained on the Laempe machine than Mr. Hubbard.  The only supervisors with whom plaintiff discussed M&H Valve's decision to name Smith leadman were

_____

machine was also considered when determining whether to designate him as leadman.

Mike Brock, his third shift supervisor, and Baldwin.  According to Hubbard, he asked for an explanation, but Baldwin did not provide one as to why Smith was given the leadman designation over Hubbard.  Both Brock and Baldwin allegedly told plaintiff they would "check on" why Smith was made a leadman.  However, Baldwin testified, he did not recall Hubbard asking Baldwin why he was not considered for that job.  Baldwin could not recall checking on the reason for Hubbard not being considered for the leadman position.

Plaintiff testified that he did not know why Smith was made a leadman in November 2000. Plaintiff believes he was better qualified than Smith for a leadman job in the core room because of his knowledge of all the jobs in that room, not just the Laempe machine.  According to Hubbard, he knew more about the core room activities than Smith since he had performed those duties for approximately twenty years at the time Smith was promoted to leadman.  Hubbard testified that he was a primary trainer of employees who came through the core room.  By Hubbard's account, he had been training employees for over twenty years in every job in the core room and specifically in the job over which Smith was promoted to leadman.  The leadman position, plaintiff asserts, meant a great deal to him regardless of what shift it was on.  Again, Hubbard stated, he had no preference for the third shift; it just provided him with the ability to make more money.  Hubbard alleged that M&H Valve never asked him what his shift preference was or if he was interested in the leadman position given to Smith.

However, Gill (who recommended Smith in the first place) testified that a prospective leadman was evaluated on his ability to work the machine to which he was assigned and ability on other jobs in the area was not as important.  Defendant highlights plaintiff's assertion in a 1999 grievance arbitration: "Out of all the leadmans, I am the only one that does jobs out of my

classification.  That Mr. Jerry LeMaster, who is white, is a Taccone operator, and when his machine is down, he is not asked to work other jobs."

While a leadman, Smith was counseled twice and then quit his employment in November 2001.  Martin testified that he did not consider Hubbard to be a lazy employee.  Martin agreed that Hubbard had always tried to make as much money at M&H Valve as possible.  Gill also categorized Hubbard as a good employee who showed up for work on time and performed his job as expected.

In 1995, Hubbard made $63,937.49 at M&H Valve.  In 1996, he made $56,649.11.  In 1997, he made approximately $61,292.40.  In 1998, he made $67,058.55.  In 1999, Hubbard made $36,800.  In 2000, Hubbard made $36,751.41.  According to plaintiff, loss of overtime pay, incentive pay, and his demotion from the leadman position that he had held up until 1999 accounted for the pay decrease between 1998 and 1999.  Plaintiff currently earns $12.31 per hour.  If he had been promoted to the position of leadman and Laempe operator, he would have earned $13.62 per hour as of October 8, 2000, $13.89 per hour as of October 7, 2001, and $14.15 per hour as of October 6, 2002.[11]

On May 1, 2001, Hubbard filed a discrimination complaint with the EEOC, claiming: "On November 27, 2000, I was denied a promotion to the position of lead man."  In his deposition, plaintiff testified "yes" to the question: "In other words, the only claim that we are here today about and that you are pursuing is that you were denied the lead man position in November of 2000 because of your race?"[12]

On June 5, 2002, the EEOC determined: "There is reasonable cause to believe that charging

---

[11] The court has been unable to pinpoint the document indicating these amounts.

[12] Later in his deposition, Hubbard stated: "The lawsuit that's pending now is on the lead man position at M&H."

9

party was denied a promotion to the position of leadman due to his race, black. ... [R]espondent's lack of an application/ selection criteria and its use of a subjective method for supervisory selections denies Charging Party and a class of Blacks access to the application and selection process." The EEOC further found that the charging party and a class of blacks had been denied promotions based on race in violation of Title VII and that a class of blacks had been subjected to retaliation by singling them out and subjecting them to intimidation.

Since the filing of his EEOC charge, plaintiff alleges, he has not been allowed to work overtime at M&H Valve. According to Hubbard, other employees were allowed to work overtime since May 2001. When Hubbard transferred to the machine shop in 2003, the employee that replaced him in the corebox machine operator job allegedly has been allowed to work up to 60 hours per week. According to Hubbard, M&H Valve also changed Hubbard's eligibility for incentive pay after he came off of the leadman job in 1999. Baldwin confirmed that M&H Valve department supervisors decide which employees work overtime. Gill testified that overtime opportunities should be divided equally.

Until recently, defendant asserts, M&H Valve selected supervisors by evaluating employees from within and accepting applications from outside the company. M&H Valve performed the evaluation within by taking recommendations from other supervisors. There were no written policies, practices, or procedures at M&H Valve with regards to hiring supervisors, and M&H Valve uses no objective grading criteria when selecting supervisors.

Between 1997 and 1998, a M&H Valve supervisor made between $35,000 and $40,000. In 1999, a supervisor made between $37,500 and $42,000. Currently, a supervisor makes between $40,000 and $54,000. Supervisors receive a better retirement plan and better insurance from

10

defendant.  Hubbard turned down a supervisory position in 1997 because he was making more money as a core box changer.  Currently, Hubbard seeks a supervisory position and has applied for supervisory training.

After filing the union grievance based on racial discrimination in 1999, Hubbard alleges, he was disciplined for an infraction when a white employee, who was guilty of a more serious offense, was not disciplined.  After plaintiff filed another union grievance for wrongful discipline, M&H Valve retracted the discipline.  On June 28, 2001, Hubbard filed a union grievance for a racial and derogatory comment made by Gill to a white third shift core machine operator.  Even though white core machine operator Stephen Caruso ("Caruso") signed a detailed written statement, the grievance was denied.  At the time, Baldwin spoke with Martin about the grievance, but Martin allegedly concluded that Caruso's statement concerning Gill's alleged racist remark was a misquote or misinterpretation.[13]  Hubbard filed a union grievance for the loss of his incentive opportunity, which was likewise denied.[14]  Hubbard also filed a union grievance for race discrimination in 1999.

In November 2000, there were 75 to 80 employees in defendant's foundry department, of which around 50 were African-American (Martin did not know the exact breakdown) and the rest were Caucasian, with the exception of one or two Hispanics.  In November 2000, there were five

---

[13] Earlier in Martin's deposition, plaintiff observes, Martin testified that he never investigated any allegations of any M&H Valve supervisors making racist remarks.

[14] This court highlights a memo dated 6/19/01 addressed to "Grievant: Core Room Employees" which discussed incentive pay as follows:

> The Core Room incentive rates were changed in accordance with Article 16.  The rates have been modified for all assigned operators and were made in the normal course of business.  Further, the Company gave notice to the Union on May 21, 2001 and the Union expressed no objections.  Additionally, the Labor Agreement does not permit multiple grievants.

supervisors in the foundry department, all of whom were white.  In November 2000, there were two leadmen in the foundry department, neither of which were black.  In November 2000, there were five or six department heads, all of whom were white.

On June 30, 2003, plaintiff filed a complaint against M&H Valve.  Claim One alleged race discrimination.[15]  This count included a number of allegations, e.g., that plaintiff was repeatedly denied advancement to higher paying jobs that he sought; that white persons in positions similar to plaintiff with less seniority obtained sought-after advances; that M&H Valve's African-American employees were given lower seniority status than defendant's white employees who have the same hire date; that defendant advanced and promoted its white employees to higher paying less labor-intensive jobs but did not do so for African-American employees; that plaintiff received lower wages than similarly situated white employees; that defendant has terminated a disproportionate number of black employees compared to white employees; and that defendant retaliated against plaintiff for failing to accept a conciliation offer made by defendant.[16]

Claim Two, entitled "Claim for Interference of Contractual Rights Because of Race," alleges[17]:

> Defendant engaged in unlawful discriminatory employment practices against Plaintiff with regard to discharge, promotions, benefits, wages, hiring, pension, discipline and other terms and conditions of employment and, upon information and belief,

----

[15] The term "retaliation," this court notes, only appears once in Hubbard's complaint, i.e., in Claim One, entitled "Claim for Race Discrimination."  In paragraph 11, Hubbard alleges: "On information and belief, Defendant retaliated against Plaintiff for failing to accept a conciliation offer made by Defendant."

[16] Plaintiff seeks a declaratory judgment of discrimination, reinstatement, an order awarding constructive seniority, lost wages and benefits, and attorneys' fees and costs.

[17] Plaintiff also seeks compensatory and punitive damages for this count.

12

Defendant has and has had a policy and custom, evidenced by an established pattern and practice executed by its agents and officials, of discriminating against black persons with respect to recruitment, hiring, compensation, promotions, discipline, discharge, pay, fringe benefits, pensions and other terms and conditions of employment.

The effect of Defendant's policy as outlined above has been to deprive Plaintiff of an equal opportunity in violation of Title VII and to deprive Plaintiff of the same right to make and enforce contracts as enjoyed by similarly situated white persons in violation of 42 U.S.C. Section 1981 . . . and . . . Section 1981A.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F. 3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**ARGUMENTS**

**MOTION FOR SUMMARY JUDGMENT**

I.   **Defendant's Motion**

A.   **Introduction**

M&H Valve construes the instant case as a racial discrimination suit under Title VII and 42 U.S.C. Section 1981. According to defendant, plaintiff asserts only one claim in this regard, i.e., that it discriminated against him based on race when in November 2000 it did not make him a leadman Laempe operator on the first shift. Specifically, defendant contends, plaintiff alleges that M&H Valve's awarding of the leadman designation to Smith, who was the Laempe machine operator on the first shift, was discriminatory.[18] Instead, defendant insists, Smith's designation was not based on discrimination but rather on Smith's "exceptional performance in that position and [its] desire for Smith to teach other Laempe operators the procedures he followed in increasing the productivity level of that machine."

The undisputed evidence, M&H Valve contends, is that there was no opening or vacancy for

---

[18] Hubbard, this court notes, also appears to assert a retaliation claim.

14

a leadman Laempe operator on the first shift; instead, M&H Valve decided to recognize Smith's exceptional performance by giving him a leadman designation. Absent Smith's exceptional performance, M&H Valve argues, there is no evidence that a leadman position on that machine would have been filled in November 2000.

Even if M&H Valve needed to designate an employee on the Laempe machine as a lead man in November 2000, defendant asserts, plaintiff cannot show he was qualified for this "position" as he was not a Laempe machine operator at that time. At the time, M&H employed only three Laempe operators, one for each of the three shifts. Making Hubbard the leadman, defendant contends, would have required displacement of one of the existing Laempe operators – an action defendant alleges is not required by either Title VII or Section 1981.

Furthermore, defendant argues, even if plaintiff could somehow show he was qualified, he cannot refute M&H Valve's evidence, via Gill's testimony, that Smith was the best and most efficient Laempe operator at M&H Valve during Gill's tenure. According to defendant, Eleventh Circuit law in the area of discrimination in promotions requires evidence that the disparity in qualifications between the plaintiff and the person actually selected is "so apparent as virtually to jump off the page and slap you in the face." *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001). Plaintiff's personal beliefs about his own qualifications, defendant argues, do not meet this standard.

Finally, defendant contends, plaintiff cannot show pretext or that the true reason for not receiving this position was race-based. According to defendant, plaintiff has completely failed to discredit Gill's testimony that he recommended Smith for the above-cited reasons. Moreover, defendant argues, there is undisputed evidence that Gill never saw plaintiff run the Laempe machine

15

and thus had no basis upon which to compare the performance of those employees on the Laempe.

> **B.      Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination With Regard to M&H Valve's Decision to Award the Leadman Designation To Smith.**

A *prima facie* case for failure to promote requires the plaintiff to demonstrate that: 1) he is a member of a protected minority; 2) he was qualified and applied for the promotion; 3) he was rejected despite his qualifications; and 4) other equally or less qualified employees who are not members of the protected minority were promoted.  *See Alexander v. Fulton County, GA*, 207 F.3d 1303, 1339 (11th Cir. 2000)(citing *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir.1999)) ; *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000).[19]  After making out this *prima facie* case, the defendant must articulate a legitimate, nondiscriminatory reason for the employee's rejection.  *Id.* If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for promoting another were pretextual.  *Id.*

"In a failure to promote case . . . a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted."  *Alexander* at 1339.  Again, defendant relies on *Cofield*, *see supra.*  For the

---

[19] Defendant deems this analytical failure-to-promote framework "awkward" in the instant case because, unlike most failure-to-promote cases, there was no vacancy for leadman position on the Laempe machine that M&H Valve was required to fill.  *See* discussion in facts section of this memorandum opinion.  In this regard, defendant contends:

> Smith was not promoted to leadman because of the absolute need for someone to fill that role; rather, a leadman role was created to recognize Smith's contributions while working as a Laempe operator and to justify asking him to train other employees.  For Plaintiff (or any other employee . . .) to claim that he was denied a 'promotion' to this position or that M&H Valve somehow wronged him by not considering him for this position reveals a fundamental misunderstanding of the process by which Smith received the leadman designation.

16

discrepancies to "jump off the page and slap you in the face," defendant repeats, they must be of such weight and significance that no reasonable person could have chosen the candidate over plaintiff. *See Lee* at 1254. Therefore, defendant argues, the relevant inquiry "is not to judge which employee was more qualified, but to determine whether any disparity . . . is so great that a reasonable fact-finder could infer that [defendant] did not believe" that the person promoted was better qualified than plaintiff. *See Cofield* at 1268.

According to M&H Valve, a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race. *See Lee* at 1253 (citation omitted). The Eleventh Circuit has consistently emphasized that a court's "role is to prevent unlawful hiring practices, not to act as a super-personnel department that second-guesses employers' business judgments." *See Id.* at 1254. *See also EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1175-76 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). This court must determine not whether M&H Valve selected the most qualified candidate, defendant urges, but only whether defendant selected candidate Smith based on an unlawful motive. *See Denney v. City of Albany*, 247 F.3d 1172 (11th Cir. 2001).

In the instant case, defendant asserts, plaintiff fails to make his prima facie case. First, M&H Valve, contends, Hubbard cannot show that he was qualified for the leadman designation because he was not a Laempe operator. Defendant reasserts its reasons for designating Smith as the leadman Laempe operator, i.e., Smith's alleged exceptional performance and a desire that he would impart knowledge to other Laempe operators. Even if other employees had been considered for a leadman designation on the Laempe machine, Gill averred, he would have only considered other Laempe operators and not other core room employees like plaintiff.

17

Furthermore, defendant contends, plaintiff cannot meet his prima facie requirement of showing that he applied for and was rejected from consideration for the leadman designation on the Laempe machine.  Anticipating plaintiff's argument that the leadman opening was not posted or otherwise published to other employees as evidence of discrimination, defendant counters: "[A]ny such argument would ignore the very simple fact that there was not a true leadman opening on the Laempe machine that [plaintiff] was eligible to apply for or to fill."  According to defendant, no other M&H Valve employee (including plaintiff) was considered (or rejected from consideration) for the leadman role.[20]

Most importantly, M&H Valve argues, plaintiff cannot show he was as qualified or more qualified than Smith for the leadman Laempe operator position awarded to Smith in November 2000.  Defendant repeats the *Cofield* standard for disparity of qualifications.  *See supra.*  While plaintiff professed to having superior knowledge of the machines in the core room, defendant argues, plaintiff's deposition testimony "ignores his own arbitration testimony in which he complained that when he worked as a leadman, he was the only leadman who was required to work outside of his classification."  Defendant relies on Gill's testimony that in considering

---

[20] Additionally, defendant argues, even assuming a first shift leadman position on the Laempe machine was vacant and that plaintiff was a Laempe operator in November 2000 (which he was not), plaintiff would likely not have been considered for this position as he had professed a clear preference to remain on the third shift.  *See* Gill Decl., ¶ 11.  However, this court notes, Hubbard insists that he never told the company that he preferred a particular shift.

While plaintiff testified that his desire to stay on third shift was related to the $.22 per hour shift differential, defendant points out, he cannot deny that he previously filed a grievance because he was moved from third shift to first shift.  In that grievance proceeding, plaintiff undeniably testified that he did not like his tenure on the first shift in December 1998.  In that same proceeding, defendant notes, Gill testified that plaintiff told him that he did not like the first shift.

18

whether to make Smith a leadman, Gill considered only his performance on the Laempe machine, not other machines in the area.  As opposed to Gill's observation of Smith's great performance as a Laempe operator, Gill testified that he never saw plaintiff run the Laempe machine.  Thus, defendant asserts, plaintiff cannot establish that Gill, the supervisor whose recommendation resulted in Smith's leadman position, knew that Hubbard was as qualified or more qualified than Smith.  As such, defendant argues, even if Gill was looking at multiple employees to "fill" the leadman position, Gill would have no basis upon which to select Hubbard.

> ### C.     Even If Plaintiff Could Establish a Prima Facie Case With Regard to His Failure-To-Promote Claim, He Cannot Establish that M&H Valve's Legitimate, Nondiscriminatory Reason for Smith's Promotion Was a Pretext for Discrimination.[21]

In presenting facts to show pretext, defendant asserts, mere conclusory allegations and assertions will not suffice.  *See McDonnell Douglas* at 802.  Defendant argues that the plaintiff always bears the "ultimate burden of persuasion," i.e., that race motivated the challenged employment decision.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 443, 499 (1993).  At the summary judgment stage, a plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a *prima facie* case and respond sufficiently to any rebuttal by defendant to create a genuine issue of material fact."  *See Palmer v. Dist. Bd. of Trustees*, 748 F.2d 595, 599 (11th Cir. 1984).  Here, defendant argues, plaintiff has failed to present evidence of pretext.

Gill's reasons for awarding the leadman designation to Smith, including Gill's assessment that Smith was the best Laempe operator he had observed during his tenure with the company,

---

[21] Defendant sets out the *McDonnell-Douglas* burden-shifting framework, with which this court is familiar.

are enumerated above. Even plaintiff has admitted that Smith is qualified for the leadman role on the Laempe machine, defendant argues. Furthermore, defendant notes, Gill testified that Smith was the only person he has ever recommended for a leadman position, leaving plaintiff unable to point to similar decisions made by Gill to show pretext.

If plaintiff relies on the fact that white employees at M&H Valve hold the majority of leadmen and supervisory positions, defendant argues, such statistical evidence still fails to overcome M&H Valve's substantial and uncontradicted reasons to make Smith a leadman. This case, defendant urges, did not involve the defendant choosing a white candidate from a pool of white and black candidates considered for a vacant position. Since Smith was given the position in recognition for his superior performance on the machine, defendant contends, at best only other Laempe operators could have challenged this decision. Again, defendant argues, awarding plaintiff the position at issue would have required M&H Valve to either transfer or terminate the existing Laempe operators.

## II.    Plaintiff's Response

_____Plaintiff and defendant agree upon the elements of a *prima facie* case for failure to promote, *see supra.*

"[W]here an employer has an informal promotion procedure, such as where job openings are not posted or the employer does not require employees to submit applications in order to be considered for a promotion, an employee may establish this element of a prima facie case simply by showing that the position was available and that the employer had some reason or duty to consider him for the post." *Miller v. Bed, Bath and Beyond, Inc.*, 185 F.Supp.2d 1253, 1267 n. 13 (N.D. Ala. 2002). In the instance case, Hubbard argues, defendant cannot deny that plaintiff

sought to earn the largest paycheck possible at M&H Valve and that his 2000 paycheck was about one-half of his 1998 paycheck.  Also, plaintiff argues, it is undeniable he had twenty years of experience training other employees, had himself been trained on the core-making machine, and had six years of previous leadman experience.[22]

Hubbard highlights *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), in which the Supreme Court opined that a prima facie case combined with sufficient evidence of falsity in the employer's asserted justification may permit the trier of fact to conclude that there was evidence of unlawful discrimination.  Hubbard notes the three types of evidence used to establish either a Title VII or Section 1981 case: direct, circumstantial, and statistical.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Both Title VII and Section 1981 have the same requirements of proof and use the same analytical framework.  *Id.*

Plaintiff relies on *Hill v. Seaboard Coast Line Railroad Company*, 767 F.2d 771, 775 (11th Cir. 1985), which involved the discriminatory treatment of carmen/formen in the context of an informal selection process for promotion.  In that case, the employees were never given notice that vacancies existed, and only the all-white supervisors knew, if at all, the subjective promotion criteria.  The *Hill* court stated in dicta: "It is difficult to imagine how a large corporation with a numerous work force can expect to satisfy its legal duties towards minorities when its selections for a promotion are made in such an unstructured and unguided manner.  Of course, subjective criteria are not discriminatory *per se* but a corporation which uses subjective criteria cannot hide behind those criteria to protect itself from a finding of discrimination."

---

[22] Plaintiff uses the "core-making machine" throughout his brief.  Apparently that term is not interchangeable with "Laempe machine."

Another Eleventh Circuit case, *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998) found: "Requirements such as the possession of 'initiative and judgment capabilities' and the ability to 'relate to people in a manner to win confidence and establish support' are incapable of objective evaluation.  They cannot be relied upon by an employer seeking to defeat the plaintiff's *prima facie* case by showing that the plaintiff is less qualified than the applicant chosen for the promotion."  Here, plaintiff contends, in discussing Smith's "ability to train," Martin touted Smith's rapport with people and good communication with supervisors.  According to Hubbard, such subjective criteria cannot be used to defeat his *prima facie* case.

Furthermore, Hubbard argues, the Eleventh Circuit has held subjective criteria to greater scrutiny than written criteria utilized in making an employment decision.  *See Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 525 (11th Cir. 1994).[23]  "[S]ubjective evaluations involving white supervisors provide a ready mechanism for racial discrimination.  This is because a supervisor is left free to indulge in a preference, if he has one, for one race of workers over another.  In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal."  *Miles*

---

[23] In this regard, *Howard* stated:

> BP has no written criteria for the selection of dealers. It merely seeks individuals with managerial, business and interpersonal skills and prefers people with prior experience in the petroleum industry. BP admits Howard meets every requirement. BP has different explanations for each station: some were given to people who already owned BP dealerships; some were given to relatives of BP dealers; one was awarded based on the recommendation of the prior owner of the station. We view these subjective and ad hoc criteria with greater scrutiny than we would if BP strictly followed written criteria.

22

*v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985)(internal citations omitted).

Plaintiff also quotes *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1010-11 (11th Cir. 1984): "The nature of the defendant's selection process and of the reasons that he offers affects the weight of his burden.  Where the reasons that the employer offers for rejection are based purely on subjective factors, the defendant's burden is greater."   "Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination."  *AKA v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998).

Regarding the parties' respective burdens, plaintiff argues, *Mays v. Union Camp Corp.*, 114 F. Supp. 2d 1233, 1238 (M.D. Ala. 2000), is illuminating:

> After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate, non-discriminatory reason for its employment action.  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *See Texas Dept. of Community Affairs v. Burdine* . . .

To prove pretext sufficient to survive summary judgment, plaintiff may either (1) show that the employer's legitimate, non-discriminatory reasons should not be believed; or (2) in light of all the evidence, the discriminatory reason more likely motivated the decision.  *See Miller* at 1270 (citations omitted).

In the absence of a formal posting system for open, available jobs, Hubbard argues, defendant has the duty to consider all employees who might have been interested in the job.  *See*

*Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261, 1275 (N.D. Ala. 1998).[24]

Relying on *Lane*, plaintiff asserts that pretext may be shown by directly comparing Hubbard's and Smith's qualifications. *See Lane* at 1278 ("Viewing the evidence in that light, there certainly could be a jury question as to whether Ms. Lane's 35 years of experience (including 20+ years with Ogden) outweigh those of a student with no experience.") According to plaintiff, defendant's argument rests on the assumption that Smith was a better core-making

---

[24] Considering plaintiff's heavy reliance on *Lane*, this court provides the following excerpts regarding pretext:

First, pretext may be shown because the qualifications for chef are never written, but instead were created by Mr. Scheiben. Scheiben Depo. at 149:20--150:10. This factor alone is enough to give the Defendant some problem on summary judgment. The Eleventh Circuit has held that "the failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination." *Carter*, 132 F.3d at 644. Where criteria are unwritten, the Eleventh Circuit has instructed that "greater scrutiny" should apply. *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994). Applying greater scrutiny here, leads to an inevitable inference of pretext.

Second, pretext is also presented where the qualifications for the job are the result of subjective analysis. The evidence supports that subjectivity was perhaps the only basis for the decision here. Mr. Scheiben based the requirements only on qualifications he thought were "understood in the industry." Scheiben Depo. at 150:4-16. His evaluation was done solely from "[his] experience as an executive in the industry." *Id.* Requirements were not sent from Ogden, or any central authority. Further, the process of hiring the chef was one controlled completely by Scheiben. Scheiben decided who to interview, did the interviews himself, and made no notes. *Id.* at 147-149. Where subjectivity on the part of differently-raced supervisors is the basis of job requirements, the Eleventh Circuit has recognized that there is a "ready mechanism for racial discrimination." *Carter*, 132 F.3d at 644. While nothing is inherently wrong with subjective criteria, such criteria "cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion." *Id.* Here, the subjectivity of the process also creates an inference of pretext.

Third, pretext is created in this case because of the contradictory and vague statements of the particular qualifications for the job. The qualifications for the job are contradictorily defined even by Mr. Scheiben himself . . . .

24

machine operator than Hubbard at the time of his promotion to leadman, as indicated by defendant's argument that Hubbard cannot disprove Smith's superior qualifications as a Laempe operator and therefore sustain a claim for race discrimination.  However, Hubbard argues, the position sought was for a leadman, not a Laempe operator, and a leadman's prime responsibility is to train other employees.[25]  Hubbard asks this court to compare Hubbard's 20+ years of training experience to Smith's one year of training experience.

If the employer does not consider a plaintiff's qualifications at the time of the employment decision, plaintiff argues, that decision cannot be defended on the basis of relative qualifications.  *See Joshi v. Florida State Univ. Health Ctr.*, 763 F.2d 1227, 1235 (11th Cir. 1985)(involving failure to hire claim).

According to plaintiff, a defendant's failure to post job vacancies can constitute circumstantial evidence of pretext.  *See Carter* at 644 ("We have held that the failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination.")(citing *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1382-83 (11th Cir. 1983)).  *Carter,* plaintiff observes, further stated: "Certainly, it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process."  *Id.* (citation omitted).  According to plaintiff, defendant's arguments that it selected Smith for the leadman position because of his ability to train and proximity to the job are false.  Even assuming *arguendo* that these were the selection criteria, plaintiff argues, "M&H broke those rules when it failed to consider Mr. Hubbard for the leadman position."  Regarding

---

[25] This argument ignores the fact that Smith was substantially a Laempe operator.  The leadman position does not stand alone.

defendant's allegation that Hubbard wasn't considered because of his shift preference, plaintiff

contends, no M&H Valve witness testified that shift preference was part of his subjective criteria

for the leadman promotion.  In evaluating pretext, Hubbard asserts, other evidence of disparate

treatment can be relevant to a trier of fact.  *See Carter*, 132 F.3d at 645.[26]

    Plaintiff analogizes his situation to those in *Roberts v. Gadsden Memorial Hospital*, 835

---

[26] *Carter's* finding regarding "other evidence of disparate treatment" involved the
following evidence:

    Additionally, several affidavits improperly stricken by the district court [FN10]
related instances of alleged disparate treatment that could be relevant to a trier of fact in
evaluating Three Springs' motives. For example, Tyrone Bowling, a former Counselor
Aide, recounted an incident involving Cook:

    FN10. In each affidavit, the affiant stated that he or she had personal knowledge
    of its contents. Furthermore, the following experiences of Three Springs
    employees are clearly legally relevant to the issue of pretext. These statements
    should, therefore, be considered to be part of the summary judgment record.

I has a problem with respect to Ms. Cook in that there was an incident in which I was
disciplined as a result of my talking with one of the adolescents about religion. This led to
my termination, but a similarly situated white employee engaged in the same contact was
not disciplined in any fashion.

Gregory Jones, an activity specialist, stated that he "was involved in an incident involving
a written reprimand for a situation dealing with the escape of one of the adolescents, but a
white employee, who also had the same offense, was not provided any written
reprimand."

Samuel Brewer, a Counselor Aide, stated that Carter and he "were paid less in [their]
positions than other non- minorities who had lesser educational degrees." Ronnie
Johnson, Counselor Aide, stated that he was asked "to be involved in the direct
monitoring of another black ... employee in order to help assist management in getting
information on this black employee so that they could terminate this person." Given the
foregoing, Carter produced evidence that, if believed, could be found to cast doubt on the
credibility of the reasons stated by Three Springs for hiring Haynes instead of Carter.

    Here, this court observes, Hubbard does not appear to have provided affidavits from other
M&H Valve employees regarding disparate treatment.

26

F.2d 793 (11th Cir. 1988) and *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir.

1984).  In the former case, Hubbard notes, the plaintiff was not considered for the position of

maintenance supervisor despite having far more skills and being the veteran employee when

compared to the promotee.  The *Roberts* court stated: "Certainly, had it occurred to Arnold (the

decisionmaker) to consider the veteran employee for the position, he would have discovered

Roberts' qualifications."  The *Roberts* court also stated: "Informal, secretive and subjective

hiring or promotion decision processes tend to facilitate the consideration of impermissible

criteria, such as race."

    *Carmichael*, Hubbard contends, involved the promotion of a white employee who had

less seniority than a black employee.  The promotion process was completely informal and

provided no checks against racial bias; rather, the only means by which an employee received

notice of a promotional opportunity was by word of mouth which circulated during lunch break

when the Caucasian foreman announced the opening.  Since the foreman socialized with white

co-employees, the plaintiff never "reaped the fruit of the white grapevine."  The *Carmichael*

court held that the employer had a duty to consider the black employee for the position under

those facts rather than assume the employee was not interested.

    Like the plaintiffs in *Roberts* and *Carmichael*, Hubbard argues, he never knew of a

promotional opportunity for the leadman position, as it was never announced.  Rather, he learned

of it after a union meeting where the union steward provided the company's notice to the union

of Smith's promotion.  Plaintiff cites *Roberts*: "Failing to consider Roberts in itself constituted

disparate treatment under these facts."  *See Roberts* at 799.  Likewise, plaintiff argues, failure to

consider him is disparate treatment.  "Where ... an employer has reason to know that an employee

is qualified for a position and that the employee might desire to be considered for that position, the employer's failure to consider the employee for promotion is not a legitimate, non-discriminatory reason sufficient to rebut the inference of intentional disparate treatment successfully raised under the *McDonnell Douglas* test." *Roberts* at 798.

As support for Hubbard's cited statistics regarding Caucasians and African-Americans who held certain jobs at M&H Valve, *see supra*, plaintiff relies on the analysis of the statistical evidence proffered in *Miles, see supra*, to show that there was overall discrimination at the defendant in its hiring of white employees.[27]   Plaintiff emphasizes that the M&H Valve foundry

---

[27] This court provides excerpts from *Miles* dealing with the appropriate use of statistics and the use in that case:

II. Statistical Evidence

As another part of her case of pretext, appellant offered statistical evidence to show that there was an overall discrimination in M.N.C. hiring in favor of whites. The district court found that the statistical evidence had methodological problems and, therefore, was not probative. In doing so, the court mischaracterized the evidence. The plaintiff's claim did not rest, as found by the district court, on the fact that M.N.C.'s general production positions were filled by white women in a community where the work force was predominantly black. Instead, Miles offered statistical proof which tended to show that the hiring rate for white applicants, referred to M.N.C. from the Alabama state employment service, far exceeded that of black applicants. [FN7] The statistical evidence introduced in the case compared the racial composition of the pool of qualified applicants with those actually hired. This is one of the appropriate statistical methods for demonstrating intentional discrimination. *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379 (5th Cir.1974).

FN7. The statistical evidence introduced by the plaintiff's expert showed: 1) among all applicants to M.N.C. the hiring rate was 38.7% for whites and 18.6% for blacks; 2) for general production positions the hiring rate for whites was 41.7% compared to 12.1% for blacks; and 3) for female applicants for general production positions (the same situation as the plaintiff) the hiring rate was 40.9% for white females and 12.2% for black females. The expert's conclusion was that the result showed a significant discrimination in favor of whites over blacks.

department had no African-American leadmen or supervisors despite the fact that the workforce

---

The district court indicated that the statistical study lacked probative value because there was no data showing whether the white applicants were more experienced, more qualified or had better experience. At the same time, however, the court correctly noted that there were no specific qualification or criteria for employment at M.N.C. Various employees testified to widely differing past employment experiences. General production work was described as unskilled labor for which there were no particular qualifications. Several of the employees testified that the entire hiring process at M.N.C. consisted of filling out an application and having a very short conversation with the plant supervisor. Evidence introduced at trial showed that M.N.C. submitted job descriptions to the Alabama employment service and that office referred the applicants who were the basis for the statistical study. As a result, the statistics were not invalidated because they lacked variables to assess experience and qualifications.

It is true that the statistical study offered did not encompass all of the 1980-1981 hiring at M.N.C.  Plaintiff's expert witnesses admitted that the study only compared the hiring rates between white and black workers referred from the state employment service and that out of the forty-nine persons reported hired during the relevant period only nineteen were referred from the Alabama state employment service.  The expert witness, however, did examine the racial composition of the pool hired from other sources and found that there was almost a three to one preference of whites over blacks. This information led the expert to conclude that the data available to him would underestimate any discrimination that would exist. Nevertheless, a study of the hiring rates did indicate what the expert characterized as significant discrimination in favor of whites over blacks. It is also true that the statistical study only measured hiring and therefore did not offer any information on rehiring.

However, the Supreme Court recognized in *McDonnell Douglas v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668, 679 (1973), that statistics as to a defendant's employment policy and practice might be helpful to a determination of whether the refusal to rehire in a particular case conformed to a general pattern of discrimination against blacks. The Court also held that such general determinations, while helpful, may not control individualized hiring decisions, particularly in the presence of otherwise justifiable reasons for refusing to rehire. 411 U.S. at 805 n. 19, 93 S.Ct. at 1826 n. 19, 36 L.Ed.2d at 679 n. 19. Miles never claimed that the statistical evidence proved her case of disparate treatment, but only that it showed a pattern of favoring whites over blacks at M.N.C. The statistical evidence supports such a claim. The district court was clearly erroneous in finding that the statistical evidence was compared to the general area population and that it was not useful because it did not reflect worker qualifications. The statistical evidence in this case provided a background against which to assess Miles' individual claim.

was primarily African-American.  Moreover, plaintiff reiterates, the company had no African-American department heads.

After citing the elements of a retaliation claim under Title VII,[28] plaintiff points out, the Eleventh Circuit has held that the causal link requirement is construed broadly, i.e, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *See E.E.O.C. v. Reichold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).  In the instant case, plaintiff argues, he has complained bitterly through union grievances since 1999 about mistreatment at the hands of M&H Valve.  According to Hubbard, his overtime and incentive pay have been taken away and he has not been considered for any promotional opportunities.  Furthermore, plaintiff contends, decisionmaker Gill was accused of a racial slur by a white employee.  This racial slur was directed at the third shift core room employees, of which Hubbard was a member.  In that instance, plaintiff repeats, Hubbard also filed a grievance which the defendant denied despite, in plaintiff's words, "overwhelming evidence and a lack of investigation on M&H Valve's part."

In light of the above authority and *Reeves v. Sanderson*,[29] plaintiff concludes, he has provided sufficient evidence to withstand summary judgment.

## III.   Defendant's Reply

### A.      Reply to Plaintiff's Listing of Claims

---

[28] The elements of retaliation are: (1) that plaintiff engaged in a statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to plaintiff's protected activities."  *See Coutu v. Martin Cty Bd. of Cty. Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995).

[29] *See supra*, p. 21.

Despite plaintiff's listing of numerous allegations from the complaint, defendant points out, Hubbard stated in his deposition that his only claim being pursued is an alleged race-based denial of the leadman position given to Smith.  The other "claims," defendant argues, do not relate to this denial of the leadman position.  For instance, defendant argues, the complaint alleged that M&H Valve engaged in unlawful discriminatory practices with respect to discharge and hiring.  However, M&H Valve asserts, plaintiff is still an employee, and he could not assert a failure-to-hire claim.  Furthermore, defendant argues, Hubbard has not attempted to comply with the court's requirement to list evidence which purports to create a jury question with regard to those additional claims.  Similarly, M&H Valve argues, plaintiff's claim that he was paid less than similarly situated white employees is simply a restatement of his failure-to-promote claim, since hourly employees' wages are dictated by the applicable collective bargaining agreement.  According to defendant, plaintiff has never alleged that he was paid less than other hourly employees in his classification.

Tellingly, M&H Valve argues, plaintiff has failed to address dispositive issues raised by defendant in the motion for summary judgment related to giving the Laempe leadman designation to Smith in November 2000.  Notably, defendant contends, plaintiff never mentions the Laempe operator position (or machine) in his entire response brief.[30]

### B.     Plaintiff Has Completely Failed to Create a Genuine Issue of Material Fact with Regard to His Failure-to-Promote Claim.

Plaintiff's brief, defendant contends, completely fails to attack M&H Valve's legitimate, nondiscriminatory reasons for giving the leadman position to Smith, i.e., Gill's recommendation

---

[30] Instead, this court notes, plaintiff does refer to a "core-making machine."

that Smith be given the leadman distinction based on his exceptional performance on the Laempe machine, and Gill's and Martin's hope that Smith would pass along his expertise to other Laempe operators.  While plaintiff characterizes the Laempe leadman designation as a "promotional opportunity" of which he should have been made aware and for which he should have been considered, defendant argues, this completely "misses the entire point of M&H Valve's summary judgment motion and brief[; that is,] <u>M&H Valve was not filling a vacant or open position when it awarded the leadman designation on the Laempe machine to Smith</u>." (Emphasis added).  Additionally, defendant reiterates, no Laempe machine operator on any shift had held the leadman designation prior to Smith, and no one has been made a leadman on the Laempe machine since Smith resigned in November 2001.

Furthermore, M&H Valve states, plaintiff's argument ignores the fact that he was not a Laempe operator in November 2000 and that giving him the leadman designation would have required M&H Valve to displace one of its current Laempe operators.  Addressing plaintiff's pretext argument based on Martin's belief regarding Hubbard's preference for third shift, defendant highlights plaintiff's sworn testimony in a 2001 arbitration proceeding that he did not like working on the first shift.  *See* Ex. 2 to Baldwin Decl..[31]  Defendant criticizes plaintiff's argument that he was similarly situated to Smith (or other Laempe operators) with respect to the leadman designation as "wholly disingenuous and completely ignor[ing] the undisputed evidence

---

[31] Specifically, Hubbard testified in that proceeding:

> *Q: Are you saying that in early January that you – in December of '98, you worked thirteen days on first shift, right?*
> A: Yes.
> *Q: You didn't like it?*
> A: No.

regarding the decision to give this title to Smith."

Finally, defendant argues, Hubbard has argued incorrectly that the use of subjective criteria in deciding to award Smith the leadman designation demonstrates racial bias against Hubbard. M&H Valve relies on case law indicating that subjective reasons can be legitimate ones. *See Chapman v. A.I. Transport*, 229 F.3d 1012, 1033-34 (11th Cir. 2000)("A subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis. Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy . . . . Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion."); *Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001)("[A]n employer's use of subjective factors in making a hiring or promotion decision does not raise a red flag. Certainly nothing in our precedent establishes that an employer's reliance upon legitimate, job-related subjective considerations suggests in its own right an intent to facilitate discrimination.")

By itself, defendant argues, M&H Valve's use of subjective criteria in making the disputed employment decision cannot support Hubbard's race discrimination claim. Again, defendant contends, Smith was not compared to other employees and "selected" for the leadman role. Instead, defendant repeats, Smith had demonstrated such a superior level of performance on the Laempe machine that Gill, Martin, and others agreed to give him a $1.00 raise and to promote him to leadman.

Defendant contends:

> In his brief, Plaintiff argues that M&H Valve's decision to give the leadman
> position to Smith "rests on the assumption that Michael Smith was a better
> core making machine operator at the time he was promoted to the position of
> leadman." This argument completely misses M&H Valve's point. First, as
> is set forth herein, Smith was not compared to Plaintiff when Gill recommended
> that he be made a leadman on the Laempe as Plaintiff was not a Laempe
> operator at the time. Gill could not have made such a comparison as Gill never
> saw Plaintiff operate that piece of equipment . . . .

According to defendant, Hubbard was a core machine operator on other machines, not the

Laempe machine, and would not have been a candidate for the leadman position. Further, M&H

Valve argues, Gill never saw plaintiff operating the Laempe machine. Accordingly, defendant

contends, even if plaintiff could demonstrate that he was a better Laempe operator than Smith

and that the disparity between his performance and Smith's was "so apparent as virtually to jump

off the page and slap you in the face," he cannot show that Gill was aware of this disparity such

that his decision to recommend Smith instead of Hubbard was discriminatory. *See supra*, *Cofield*

at 1268 (11th Cir. 2001).

### C.    M&H Valve is Entitled to Summary Judgment on Plaintiff's Retaliation Claim.

Initially, defendant asserts, Hubbard claimed that M&H Valve retaliated against him for

filing grievances in 1998 and 1999, by taking away his overtime pay, incentive pay, and leadman

pay. However, defendant alleges, plaintiff conceded that his May 1, 2001 EEOC charge did not

contain a retaliation claim because none of the actions he claimed were retaliatory took place in

the 180 days prior to filing this charge.[32]  Defendant again highlights plaintiff's deposition

---

[32] However, this court notes, another part of Hubbard's deposition reads as follows:

> Q: So all those grievances to which you're now saying the company retaliated
> against you, those were in 1998 and 1999?
> A: Yes, and 2000.

testimony regarding overtime pay changes in 1998:

> Q: So the EEOC said that [the retaliation claim] was untimely?
> A: Yes.
> Q: And yet you filed a lawsuit here in June of 2003 and you're somehow making a claim in this lawsuit that something that happened to you in 1998 could be timely?
> A: The lawsuit that's pending now is on the lead man position at M&H.
> Q: And that's all it's about?
> A: Yes.
>           ....
> Q: Do you know of any other claims you're making here today other than you were denied the lead man position in November of 2000 because of your race?
> A: No.

Defendant argues: "Plaintiff's counsel's attempt to make ... a [retaliation] claim on his client's

behalf at this late stage should be completely discarded and M&H Valve should be granted

summary judgment on such a claim as a matter of law."

Addressing plaintiff's counsel's argument that "[s]ince the filing of his EEOC charge,

Mr. Hubbard has not been allowed to work overtime at M&H Valve" while other employees

have, defendant argues, there is no evidence to support either of these allegations.[33]  Even should

the court hold that plaintiff has asserted a retaliation claim, defendant argues, the unsupported

---

> *Q: Well, you just told me about grievances in '98 and '99.  What are you talking about in 2000?*
> A: 2000 I filed a racial discrimination.  That's what this was (indicating).
> .....
> *Q: So the internal grievances were in '98 and '99, and then you made a claim in 2000 that you were denied the lead man position because of your race?*
> A: Yes.

[33] Plaintiff's claim that M&H Valve changed his eligibility for incentive pay is also meritless, defendant asserts, since Hubbard testified that this change took place in 1998 (making it untimely).

allegations regarding overtime fall short of establishing a *prima facie* case of retaliation. According to defendant, plaintiff cannot show a causal connection between the alleged denial of overtime and Hubbard's filing of his EEOC charge, and plaintiff has not cited a statement by any M&H Valve employee or supervisor suggesting that any decisions related to his hours of work were made in retaliation for such filing.

**IV.     Plaintiff's Reply**

Hubbard's response to a Motion to Compel and Motion to Stay filed by him in this case appears to constitute his reply.

**MOTION TO STRIKE**[34]

In Hubbard's response brief regarding his Motion to Compel and Motion to Stay (which constitutes a final reply to the motion for summary judgment), defendant argues, Hubbard employs for the first time a "crude and unscientific" statistical analysis which defendant contends is inadequate and must be disregarded by the court.  According to M&H Valve, Hubbard has neither referred to nor followed the method for statistical proof set out in *National Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).[35]  Additionally, defendant argues, plaintiff fails to demonstrate how the proffered statistics have any bearing on what defendant deems is the sole decision at issue in this case, i.e., the decision to designate Smith as a leadman on the Laempe machine on November 27, 2000.[36]  At this late date, M&H Valve contends, plaintiff should not be

_____

[34] The court has been unable to locate any response from Hubbard to the motion to strike.

[35] M&H Valve does not elaborate on this case.

[36] Defendant argues: "It is likely more than coincidental that Plaintiff's time frame for analyzing the leadman position at M&H Valve starts during the year 2000 as Plaintiff himself held the leadman designation for part of 1999 and his inclusion would have a clear negative

allowed to "shift gears" as the "obvious result of a complete lack of direct or circumstantial evidence of discrimination." Defendant asks the court disregard completely the statistics in "Plaintiff's Response to Defendant's Response to Plaintiff's Motion to Compel and Motion to Stay Ruling on Defendant's Motion for Summary Judgment."

## CONCLUSIONS OF COURT

The best this court can determine, the plaintiff purports to "specifically" complain about not having been given the job of leadman over the Laempe coremaking machine in the foundry department of defendant on November 27, 2000. The job was given to Michael Smith.

At the time Smith was given the job, he was a Laempe operator on the first shift where he remained. At that time, plaintiff was a core machine operator on the third shift. Without repeating all of the facts recited above, the court concludes that it is obvious that plaintiff and Smith were not similarly situated at the time Smith was designated as leadman on the Laempe machine. Assuming, without deciding, that the designation should even be considered as filling a vacant position, it is apparent that there is no reasonable inference of intentional discrimination with regard to Smith's assignment.

The designation of Smith as leadman was at a time when he and only two other employees were Laempe operators. There is no dispute that he had evidenced substantial proficiency in the operation of the machine. The designation was simply a naming of one of three Laempe operators as leadman. If plaintiff had been so designated he would have replaced an existing Laempe operator, changed shifts and vacated his then job. The court will not repeat the evidence concerning plaintiff's reluctance to work on the first shift. Plaintiff had not

---

impact on the results of Plaintiff's analysis."

specifically bid for a Laempe operator position on the first shift or otherwise.  There is no

reasonable inference that his not being considered was intentional discrimination.

Among the "evidence" which the plaintiff cites in support of his position is the following:

> Martin was not aware that Hubbard had been trained to operate the Laempe
> machine over which Smith was promoted to leadman.

This does not suggest that Martin made an intentional discriminatory decision.  It would suggest

to the contrary.

As of November 2000, Smith was proficiently operating the Laempe machine.  The

decision to promote him certainly does not "jump off the page and slap one in the face."  The

following quotes from *Lee v. GTE Florida, Inc.,* 226 F.3d 1249 (11th Cir. 2000), and *Cofield v.*

*Goldkist, Inc.,* 267 F.3d 1264 (11th Cir. 2001), have application here:

<u>Lee</u>[37]

> Because the evidence Lee presented at trial to prove pretext was not legally
> sufficient to support a jury verdict in her favor, the district court erred in denying
> GTE's motion for judgment as a matter of law and we reverse.

*Lee*, 226 F.3d at 1251.

– – – – –

> Shaffer testified that he ultimately chose Colin Hines because Shaffer believed
> Hines was more qualified than Lee (and the other candidates).

*Id.* at 1252.

– – – – –

> In a failure to promote case, a plaintiff cannot prove pretext by simply showing
> that she was better qualified than the individual who received the position that she
> wanted. A plaintiff must show not merely that the defendant's employment
> decisions were mistaken but that they were in fact motivated by sex. *See*

---

[37] It should be noted that *Lee* reversed a judgment after a trial.  226 F.3d 1249, 1251 (11th Cir. 2000).

38

*Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000). We have explained that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997), *cert. denied, sub nom.*, *Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999), *cert. denied*, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir.1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position. . . . The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination.")

*Id.* at 1253.

– – – – –

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County*, 207 F.3d at 1340. In *Deines*, for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase "jump off the page and slap [you] in the face" . . . should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact. *Id.* at 280-81.

*Id.* at 1254.

– – – – –

Lee argues, nevertheless, that Shaffer's stated reason for denying her the promotion was pretextual because in her opinion she was more qualified than

39

Hines. On this record, however, the evidence is insufficient to raise a genuine issue of fact regarding whether GTE's stated reason for promoting Hines instead of her is pretextual. None of Lee's proffered evidence established that she was more qualified than Hines, let alone so clearly more qualified for the position than Hines that a reasonable juror could infer discriminatory intent from the comparison. *See Fulton County*, 207 F.3d at 1340; *Deines*, 164 F.3d at 280-81; *Simms*, 165 F.3d at 1329-30. Indeed, the evidence establishes that, of the four stated criteria in the position questionnaire, Lee was clearly more qualified tha[n] Hines in only one--that of commercial real estate experience. Further, GTE never disputed that Lee had more real estate experience than Hines, but said that real estate experience was the least important of the four criteria because the real estate function of the position had been outsourced. As for the first two criteria in the position questionnaire--managerial skills and strategic planning experience--the evidence established at most that the candidates were equally qualified. As for the preference for a Bachelor's degree, Hines was decidedly more qualified than Lee.

Quite simply, this evidence does not rise to the level of proof that is required when an employee attempts to prove pretext by showing she was substantially more qualified than the person promoted. Since Lee's evidence at trial fell far short of establishing that she was clearly more qualified for the position than Hines, Lee did not meet her burden of establishing that Shaffer's proffered reason for denying her the promotion was a pretext for gender discrimination.

*Id.* at 1255.

*Cofield*[38]

According to Goldkist, Bowen was hired because he was more qualified for the Plant Superintendent position than Cofield. This articulated reason casts the burden on Cofield to demonstrate that Goldkist's reason is pretextual. *See* [*McDonnell Douglas Corp v. Green*, 411 U.S. 792,] 804, 93 S.Ct. [1817,] 1825 [(1973)]; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The only issue for us to determine, therefore, is whether Cofield has advanced sufficient evidence for a jury to find that Goldkist's articulated reason is pretextual.

*Cofield*, 267 F.3d at 1268.

– – – – –

Cofield challenges the district court's memorandum opinion because it only addresses her ADEA claim. The district court, however, expressly granted

---

[38] In *Cofield* the appellate court affirmed a grant of summary judgment.  267 F.3d 1264, 1265 (11th Cir. 2001).

summary judgment to Goldkist on Cofield's ADEA claim and on her Title VII claim because she failed to show pretext. Although the *McDonnell Douglas* framework originally applied to Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (recognizing widespread application of *McDonnell Douglas* framework to ADEA claims); *Chapman* [*v. AI Transport*], 229 F.3d [1012,] 1024 [(11th Cir. 2000)] (applying *McDonnell Douglas* framework to ADEA claim). Because the legal analysis is the same with respect to both of Cofield's claims, the district court did not need to analyze each claim separately.

*Id.* at 1268 n.6.

− − − − −

The gravamen of Cofield's pretext argument is that she was more qualified for the Plant Superintendent position than Bowen. Cofield cannot, however, establish pretext simply by showing that she is more qualified than Bowen. *See Lee v. GTE Fla.*, Inc., 226 F.3d 1249, 1253 (11th Cir.2000). Rather, Cofield must adduce evidence that the disparity in qualifications is "so apparent as virtually to jump off the page and slap you in the face." *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir.2001); *Lee*, 226 F.3d at 1254; *Alexander v. Fulton County*, Ga., 207 F.3d 1303, 1340 (11th Cir.2000) (all quoting *Deines v. Texas Dep't of Protective & Regulatory Serv.*, 164 F.3d 277, 280 (5th Cir.1999)). The relevant inquiry for us, then, is not to judge which employee was more qualified, but to determine whether any disparity between Bowen's and Cofield's managerial qualifications is so great that a reasonable fact-finder could infer that Goldkist did not believe Bowen to be better qualified.

*Id.* at 1268 (emphasis added).

− − − − −

Cofield also supports her pretext claim by arguing that Goldkist relied only on subjective factors in reaching a decision not to promote her. This argument lacks merit, however, in light of our recent *en banc* decision in *Chapman*. There, we emphasized that subjective reasons can constitute legally sufficient, nondiscriminatory reasons under the *McDonnell Douglas* framework. *Chapman*, 229 F.3d at 1033.

*Id.* at 1268 n.7 (emphasis added).

− − − − −

41

> Put simply, any disparity in qualifications that may exist here is so slight as to fail to establish that Goldkist's reason for not promoting Cofield was pretexual. We may safely assume that Cofield was qualified to be a Plant Superintendent at Goldkist. Cofield may even be justified in believing she was more qualified than Bowen for that position. But Cofield's qualifications are not so superior as to allow a reasonable fact-finder to conclude that Goldkist's reason for hiring Bowen was pretexual. <u>We will not second guess Goldkist's decision to emphasize qualifications over length of service.</u> See *Chapman*, 229 F.3d at 1030 ("[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

*Id.* at 1269 (emphasis added).  *See also Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1090 (11th Cir. 2004), *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001), *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1340 (11th Cir. 2000) (all quoting *Deines v. Texas Dep't of Protective & Regulatory Serv.,* 164 F.3d 277, 280 (5th Cir. 1999), for the proposition that the disparity in qualifications must be "so apparent as virtually to jump off the page and slap you in the face").

The only pause that this court has had with regard to the Smith promotion is with regard to the EEOC determination.  Discovery has established that the determination is anything but trustworthy.  Furthermore there were no factual findings, merely a conclusory determination.

The landmark decision with regard to the admissibility of EEOC determinations is *Smith v. Universal Services, Inc.,* 454 F.2d 154 (5th Cir. 1972).  In *Price v. Federal Exp. Corp.*, 283 F.3d 715 (5th Cir. 2002), the court noted:

> Price relies on *Smith v. Universal Services, Inc.* to support his argument. 454 F.2d 154 (5th Cir.1972). In *Smith*, we held that the district court was required to take an EEOC investigative report into consideration when deciding a Title VII claim, because failure to do so would be "wasteful and unnecessary." *Id.* at 157. *Smith* can be readily distinguished because that case involved an EEOC investigative report, as opposed to a single determination letter. *Id.* (referring to contents of report as containing summary of charges, review of facts as developed during

investigation, and finding of probable cause). As far as we can determine from the record, the EEOC in this case never conducted interviews with anyone other than Price, or compiled an investigative report. Furthermore, there is no evidence in this case indicating that the district judge ignored the EEOC's letter, unlike the facts of *Smith. Id.* at 158. We therefore find *Smith* unpersuasive.

In addition, the EEOC's findings of racial discrimination are not dispositive in later racial discrimination suits. Despite an earlier positive finding of discrimination by the EEOC, we have held in subsequent suits that the plaintiff was not discriminated against by his or her employer. *See Vadie* [*v. Mississippi State University*], 218 F.3d [365,] 370 (upholding judgment as a matter of law reversing jury verdict after plaintiff had filed a charge with the EEOC and had received a right to sue letter); *Odom* [*v. Frank*], 3 F.3d [839,] 843 (holding that district court's finding that plaintiff was discriminated against was clearly erroneous, despite EEOC's conclusion that plaintiff had been discriminated against); *Cf. Smith*, 454 F.2d at 157 (stating that subsequent civil litigation is de novo proceeding, "completely separate from the actions of the EEOC").

283 F.3d at 725.  The Court affirmed the grant of a motion for summary judgment.  *Id.*  The case also has significant discussions which otherwise apply to this case.

The Eleventh Circuit has consistently held that EEOC determinations may or may not be admissible depending on the nature and trustworthiness of the EEOC investigation and findings. *See Lathem v. Dep't of Children and Youth Servs.,* 172 F.3d 786, 791-92 (11th Cir. 1999)(upholding district court's refusal to admit EEOC's determination), *Barfield v. Orange County,* 911 F.2d 644, 649-51 (11th Cir. 1990)(upholding trial court's ruling admitting EEOC report into evidence), *Dickerson v. Metropolitan Dade County,* 659 F.2d 574, 579 (5th Cir. 1981)[39](upholding district court's exclusion of EEOC investigator's testimony regarding his

---

[39] Although *Dickerson* is a Fifth Circuit case decided after September 30, 1981, it has precedential value as it was decided by Unit B of the Circuit.  *See Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1331 n.1 (11th Cir. 2004) (stating, "[i]n *Stein v. Reynolds Secs., Inc.,* 667 F.2d 33 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981").

evaluation of facts already in evidence). *Compare E.E.O.C. v. Total System Servs., Inc.*

221 F.3d 1171, 1177 (11th Cir. 2000)(affirming grant of summary judgment for defendant when

action was brought by EEOC).

This court notes the following with respect to the EEOC determination. The EEOC did

not significantly determine any facts. It simply considered the respective allegations of the

parties and reached conclusions based on those allegations. The first conclusion was that the

defendant could not consider plaintiff's prior reluctance to work on the first shift. The defendant

did not offer that as its sole reason. Its primary reason was that Smith was already performing

the primary job as Laempe operator. Plaintiff's earlier reluctance to work on the first shift was

only a further suggestion as to why the plaintiff suffered no injury based on alleged

discrimination.

Further, contrary to Eleventh Circuit law, the EEOC over emphasized the subjective

nature of the decisions to give Smith the leadman position. Even assuming that a recognition a

person is a good producer is "subjective," the Eleventh Circuit does not hold that such decisions

are per se discriminatory. The EEOC apparently gave no consideration to the fact that, primarily,

Smith remained in the same job and that plaintiff was not similarly situated. There is no

reasonable inference of intentional discrimination as to the leadman Laempe operator

job—whether viewed as a *Daubert* determination or otherwise. The EEOC conclusion is not

admissible.

Plaintiff's argument is in essence that, since he had seniority, he was entitled to the job.

That is not the measure.[40]  There is no direct evidence of discrimination.  Assuming, without

deciding, that plaintiff has proved a prima facie case, defendant has articulated that it determined

Smith to be better qualified.  Plaintiff has not presented sufficient evidence to establish pretext.

Furthermore, the employees were not similarly situated.  The plaintiff's purported statistical

evidence is insufficient.  *See Cooper v. Southern Co.,* 2004 WL 2537436 (11th Cir. 2004);

*Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079 (11th Cir. 2004).

At this stage, the court determines that there is no genuine issue of fact or law with

reference to the Laempe operator leadman position and Smith.  Summary Judgement will be

granted as to that claim.  The court will set consideration of the possible hodgepodge of other

---

[40] The plaintiff in *Cofield* had worked with the employer twenty-eight years.  267 F.3d at 1266.  The person given the position had worked for the employer eight years and was fourteen years younger than the plaintiff.  *Id.*  The court observed:

> Throughout her lengthy employment with Goldkist, Cofield gained experience in the operations of the poultry production business. She also performed many of the job duties associated with the Plant Superintendent position. As Unit Manger II, Cofield supervised 110 to 115 employees, but she did not have the direct authority to interview, hire, promote, or terminate employees. Cofield received favorable evaluations from her supervisors, and several of her evaluations indicated that she could perform in a Plant Superintendent position.  She was disciplined only once, on September 10, 1997, for giving improper instructions to shipping personnel. This reprimand occurred during the interval between the opening of the Plant Superintendent positions in 1996 and in 1998.

*Id.* at 1266-67.  The court added,

> We will not second guess Goldkist's decision to emphasize qualifications over length of service. See *Chapman* [*v. AI Transport*], 229 F.3d [1012,] 1030 [(11th Cir. 2000)] ("[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

*Id.* at 1269.

45

claims for oral argument.

This 27th day of December, 2004.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**