**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **JAMES HUBBARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: CV-03-PT-1587-M** |
| | ) | |
| **M & H VALVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant M&H Valve Company's Supplemental

Motion for Summary Judgment, filed on February 4, 2005.

**FACTS[1] & PROCEDURAL HISTORY[2]**

**I. Introduction and Procedural History.**

Plaintiff James Hubbard ("Hubbard") filed this action on June 30, 2003 against his

employer M&H Valve Company ("M&H Valve").[3]  On April 21, 2004, M&H Valve filed an

---

[1] The court notes where "facts" appear disputed.

[2] This court issued a Memorandum Opinion regarding defendant's original Motion for Summary Judgement in this matter on December 27, 2004.  That Opinion details many other facts relevant to this cause of action which are not repeated here.

[3] Hubbard filed his Charge of Discrimination with the EEOC on May 1, 2001.  The charge alleged race and age discrimination (but not retaliation) and stated:

> On November 27, 2000, I was denied a promotion to the position of leadman by the above-named employer.  I have been employed since March 1972, and my current position is machine operator.

original Motion for Summary Judgment.  In an December 27, 2004 Order, this court granted that Motion in part, dismissing with prejudice plaintiff's failure to promote claim regarding the position of Laempe operator leadman which was filled by Michael Smith on or about November 27, 2000.[4]

In a January 18, 2005 hearing on this matter, plaintiff's counsel maintained that Hubbard continues to assert two retaliation claims related to his participation in a January 13, 1999 race discrimination grievance filed by a fellow M&H Valve employee.[5]  According to M&H Valve, that grievance was filed by employee Jerry Summerlin and was signed by Hubbard and 36 other African-American employees at M&H Valve.  The grievance alleged that African-American employees had been denied promotion opportunities at M&H Valve.  M&H Valve states that the grievance was answered by Mike Fulmer, the Manager of the Foundry, and that Doug Martin

_____

> Doug Martin, White Foundry Superintendent, informed me that the leadman position was awarded to a more qualified employee.
>
> I believe I have been discriminated against because of my race (Black) and age (DOB 1/31/50), in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act.  Although I had held the leadman position for a period of six years before being reassigned in 1999, the employer promoted a younger employee, White, to the position of leadman.  While serving as leadman for a six year period, I experienced no problems with performance or discipline.
>
> The above-named employer discriminates against Blacks as a class with respect to promotion to supervisory positions.

[4] For more information regarding this claim, see this court's December 27, 2004 Memorandum Opinion.

[5] The only mention of retaliation in plaintiff's Complaint is contained in Claim One, paragraph 11, which states "On information and belief, Defendant retaliated against Plaintiff for failing to accept a conciliation offer made by Defendant."  (Cmpt. ¶ 11).

("Martin"), the Machine Shop Manager who made the employment decisions Hubbard challenges in this matter, was not even aware that the grievance had been filed.[6]

Hubbard's first retaliation claim arises from M&H Valve changing the manner in which it paid Hubbard incentive pay. Hubbard's second retaliation claim is that M&H Valve denied him overtime opportunities made available to other employees in his classification(s).[7]

---

[6] Martin testified:

> . . . However, because Mr. Summerlin worked in the Machine Shop, this grievance would not have been presented to me. In fact, I did not become aware of this grievance until after Mr. Hubbard filed the present lawsuit.

(Martin Decl., ¶ 11).

[7] Defendant asserts that plaintiff did not assert or acknowledge these claims during his deposition testimony. Defendant highlights plaintiff's following testimony:

> A:  The lawsuit that's pending now is on the lead man position at M&H.
> Q:  And that's all it's about?
> A:  Yes.
>      ....
> Q:  Do you know of any other claims you're making here today other than you were denied the lead man position in November of 2000 because of your race?
> A:  No.
> Q:  In your judgment as you sit here in your sworn deposition, that's the only claim you're making?
> A:  Yes.

(Hubbard Depo., pp. 71-73).

> Q:  All right. Let's talk about the taking away the overtime pay. When did that occur?
> A:  Well, that was back in '98. That ain't got nothing to do with this [lawsuit].

(Hubbard Depo., p. 70).

Plaintiff, however, asserts that his retaliation claims were fully set out in his original

3

## II.     Facts Relevant to Plaintiff's Incentive Pay Retaliation Claim.

Roger Baldwin ("Baldwin"), M&H Valve's Personnel Manager, testified that Hubbard

worked for M&H Valve on the third shift (10:00 p.m. to 6:00 a.m.) as a utility core machine

operator between 1993 and March 2000.  (3rd Baldwin Decl., ¶ 4).  Plaintiff however testified

that he believed his position between 1995 and 2000 was "core box changer."  (Hubbard Depo.,

p. 26).  M&H Valve asserts that, between 1993 and May 3, 1995, M&H Valve employed only

one core box changer, William Varner ("Varner"), who worked on the first shift (6:00 a.m. to

2:00 p.m.).  Baldwin testified that Varner assisted the 5-6 core machine operators on their

respective shifts by changing core boxes on the core machines to allow those machines to

produce different types of cores.  (3rd Baldwin Decl., ¶ 4).  Baldwin stated that, as a core box

changer, Varner received incentive pay[8] based on the overall production of the core machine

---

response to defendant's original Motion for Summary Judgment.  Further, plaintiff contends,
defendant's recent evidentiary submissions were not produced during discovery in this action.
For example, plaintiff argues that Zan Elliot was never identified as a witness and the payroll
records attached to his declaration were not produced earlier.

Defendant addresses plaintiff's complaints that certain evidence was not produced during
discovery.  Defendant maintains that plaintiff cannot now complain in this manner because: (1)
plaintiff denied having any claims in this lawsuit other than his failure-to-promote claim relating
to Michael Smith; and (2) plaintiff never requested through discovery any documents reflecting
the hours worked by the co-workers he now claims were given better hours.  Defendant points to
plaintiff's above quoted testimony and argues that it clearly cannot be said to have been on notice
that plaintiff was making the claims his attorney identified at the January 18, 2005 hearing in this
matter.

[8] Baldwin testified that some production employees are entitled to "incentive pay" based
on their production levels.  (3rd Baldwin Decl., ¶ 3).  Baldwin stated:

> For example, core machine operators (an "incentive" job) are given a target
> number of cores to produce during a given shift and receive additional pay for
> cores produced in excess of that target number.

(*Id.*)

operators.  (*Id.*).  On May 3, 1995, after Varner left, the core box changer position was

completely eliminated.  (*Id.*)  According to M&H Valve, plaintiff never held the core box

changer position.

Martin, M&H Valve's Foundry Manager, testified that, as a utility core machine operator,

Hubbard was responsible for relieving core machine operators who were on break (or absent) and

also changed core boxes on those machines when necessary.  (Martin Decl., ¶ 3).  Zan Elliott

("Elliott"), M&H Valve's Cost Accountant, stated that instead of receiving incentive payments

based on the overall production of all the core machine operators for the entire shift (like the core

box changers), it was M&H Valve's policy to make incentive payments to utility core makers

only for the portion of their shift during which they were actually operating the core machines

and not for the time in which they were doing other tasks.  (Elliott Decl., ¶ 4).

According to Elliott, although Hubbard was a utility core machine operator at all times

between 1993 and March 2000, M&H Valve's payroll department mistakenly paid him as if he

were a core box changer.  (Elliot Decl., ¶ 4).  Therefore, Hubbard was given incentive pay based

on the overall production of all core machine operators instead of paying him incentive pay only

for the time he actually operated a core machine.  (*Id.*)  In contrast, Elliot testified, the other

utility core machine operator, Bobby Raulerson, a white male who worked on the first shift, was

paid incentive only for the time he actually operated a core machine.  (*Id.*)

Martin stated that he eventually discovered that Hubbard was being incorrectly paid

incentive pay for his entire shift instead of earning incentive pay for the time he actually operated

a chore machine.  (Martin Decl., ¶ 10).  According to Martin, he fixed this payroll error and,

beginning on June 6, 1999, Hubbard began receiving incentive pay only for the portion of each

shift in which he operated the core machines.  (*Id.*)  Martin testified that Hubbard continued to be eligible for and to receive incentive pay; only the manner in which his incentive pay was calculated changed.  (*Id.*)

Hubbard gives a different version of events considering his decrease in incentive pay. According to Hubbard, his incentive pay was decreased on or around June 5, 2001 following the filing his charge of discrimination with the E.E.O.C. on May 1, 2001.  Hubbard has produced documents arising out of a grievance meeting held on June 19, 2001.  The documents indicate that the Core Room incentive rates were changed for all assigned operators in the room.

**III.   Facts Relevant to Plaintiff's Overtime Retaliation Claim.**

Martin testified that in December 1998 David Green ("Green"), who had recently been hired as Vice President and General Manager at M&H Valve, told him to improve the efficiency in the Foundry (which included the core room).  (Martin Decl., ¶ 5).  According to Martin, Green stated that he intended to upgrade the Foundry and wanted to know what costs might be reduced by eliminating jobs in the Foundry.  (*Id.*)  Green instructed Martin to first look at the hours worked by employees in the core room to see whether there were positions that could be eliminated.  (*Id.*)  Martin testified that, upon looking into the matter, he was "shocked" by the number of hours Hubbard had been allowed to work as utility core machine operator on the third shift.  (*Id.*)  Elliott attached to his declaration handwritten summaries of the weekly hours worked by Hubbard between December 28, 1997 and December 26, 1999.  (Elliott Decl., ¶ 5).  These summaries were taken from the company's payroll records.  (*Id.*)  M&H Valve points out that between March 1, 1998 and May 24, 1998 Hubbard worked, in consecutive weeks, 78.5, 70.5,

77, 68, 74, 71.5, 58.5, 71, 95, 74, 73.5, 88.5, and 70.5 hours.[9]  Martin stated:

> Because Mr. Hubbard earned time-and-a-half pay for each hour in excess of forty worked each week, M&H Valve was paying Mr. Hubbard substantial sums of money without any obvious need for him to be at work for so many hours. Moreover, Mr. Hubbard was working many more hours than Bobby Raulerson, the other utility core machine operator, and an even greater number of hours more than the core machine operators with which he worked.

(Martin Decl., ¶ 6).

Martin testified that, in December 1998, he began requiring that core machine operators change their own core boxes instead of relying on Hubbard to perform this task.  (Martin Decl., ¶ 7).  Prior to this time, according to Martin, Hubbard had spent a considerable amount of time changing core boxes and had not been operating the core making machines, as his position required.  (*Id.*)  Martin stated that, unlike Hubbard, Raulerson, the utility core machine operator on the first shift, had not been spending much time changing core boxes.  (*Id.*)  After the December 1998 change, Martin asserted, Hubbard was instructed to operate the core making machines as required by his classification.  (*Id.*)  The company's decision to require core machine operators to change their own core boxes resulted in Hubbard losing overtime hours.  (*Id.*)  Hubbard was no longer staying after his shift to set up core boxes for the core machine operators on the first shift.  (*Id.*)  As a result of this change, Hubbard began working the same or similar

---

[9] Martin testified:

> I was also amazed to see that Mr. Hubbard earned over $67,000 in 1998 while working in a job that paid just over $10.00 an hour plus some incentive pay. Virtually every other core machine operator at M&H Valve earned less than $40,000 that year.  Moreover, Mr. Hubbard was earning significantly more than all of the supervisors at that time.

(Martin Decl., ¶ 5).

hours as the core machine operators on his shift and as Raulerson on the first shift.  (*Id.*)

Martin further testified that Hubbard's overtime hours were also reduced in December 1998 by the addition of a third-shift supervisor in the core room.  (Martin Decl., ¶ 8).  The responsibilities of Hubbard, who held the leadman designation, were diminished by the presence of the supervisor.  (*Id.*)  Therefore, Martin stated, the number of hours Hubbard worked were also diminished.  (*Id.*)

Martin stated that, in December 1998, he discovered that Hubbard had been taking advantage of a provision in M&H Valve's collective bargaining agreement that allowed him to be paid for 8 hours of additional work each week (usually at overtime rates) by coming in two hours early every Sunday.  (Martin Decl., ¶ 9).  Under the agreement, an employee was entitled to double pay for any shift in which he or she was "called in" and also entitled to double pay for working on Sunday.  (*Id.*)  According to Martin, every Sunday Hubbard would come in two hours early and claim "call-in" pay for those hours.  (*Id.*)  Martin asserted that this practice resulted in Hubbard being paid for working eight hours because those two hours were doubled twice for Sunday pay and "call-in" pay.  (*Id.*)  After discovering what Hubbard had been doing, Martin stopped the practice, causing a loss of 8 hours of overtime each week for Hubbard.  (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears

the initial burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial."  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.  *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery.  *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F. 3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**ARGUMENTS**[10]

**I.**   **Defendant's Motion**.

    **A.**   **Plaintiff's Retaliation Claims Are Time-Barred.**

---

[10] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

It is defendant's position that both of plaintiff's retaliation claims are time-barred.  Even assuming that plaintiff's retaliation claims under § 1981[11] are subject to a four-year statute of limitations, defendant argues, plaintiff's retaliation claims both arose more than four years prior to June 30, 2003, the date plaintiff filed this lawsuit.

### 1.    Plaintiff's Overtime Hours Retaliation Claim Is Time-Barred.

Defendant asserts that plaintiff's claim that Martin allowed him to work fewer hours after the January 13, 1999 grievance than before is time-barred.

Defendant first addresses the claim itself.  According to defendant, the evidence shows that plaintiff's reduced hours corresponded to three actions taken by Martin in December 1998.  First, defendant asserts, Martin began to require that core machine operators change their own core boxes instead of having the task performed by plaintiff.  Defendant argues that this change allowed plaintiff, who was then a utility core machine operator, to perform the primary function of that position–to fill in for core machine operators who needed a break or were absent from work for some reason.  After M&H Valve began requiring core machine operators to change their own core boxes, defendant asserts, plaintiff began working the same number of hours as the regular core machine operators on his shift and as Raulerson, the utility core machine operator on the first shift.

Second, defendant argues, M&H Valve added a supervisor to the third shift in the core room in December 1998.  According to defendant, this change eliminated many of the leadership tasks of

---

[11] Defendant argues that, although it is doubtful that plaintiff's retaliation claims also fall under Title VII, any such claims would clearly be barred for at least two reasons: (1) plaintiff's sole charge of discrimination against M&H Valve did not include a claim of retaliation and, therefore, plaintiff has not exhausted his administrative remedies with regard to this claim; and (2) none of the actions challenged by plaintiff as retaliatory took place within 180 days of May 1, 2001, the date plaintiff filed his EEOC charge.

plaintiff, who was a leadman in the core room at the time. Defendant further maintains that having a supervisor on the third shift prevented plaintiff from staying "on the clock" unnecessarily. Finally, defendant points out, Martin, who joined M&H Valve in September 1998, discovered and stopped plaintiff's practice of coming in two hours early on Sunday to receive eight additional hours of "call-in" pay.

Clearly, defendant contends, each of these decisions was made in December 1998, approximately 4 ½ years before plaintiff filed this lawsuit. Additionally, defendant notes that the grievance which allegedly caused the retaliatory actions was not filed until January 1999, approximately one month after the actions that reduced plaintiff's hours. Given this evidence, defendant concludes, plaintiff's retaliation claim regarding the reduction of his work hours is barred by the applicable statute of limitations under § 1981, and M&H Valve is entitled to summary judgment on this claim.

### 2.    Plaintiff's Incentive Pay Retaliation Claim Is Time-Barred.

Defendant further maintains that plaintiff's second retaliation claim regarding the reduction in his incentive pay is also barred by the statute of limitations under § 1981. According to defendant, the evidence shows that, on June 6, 1999, M&H Valve corrected the manner in which plaintiff was paid incentive to be consistent with the company's policy. This action, defendant argues, was taken more than four years before plaintiff filed this suit.

### B.    Plaintiff Cannot Establish a Prima Face Case of Retaliation.

Defendant notes that, under Title VII, employees are protected from retaliation for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. §2000e-3(a); 29 U.S.C. § 623(d). Because plaintiff has not and cannot present direct or

statistical evidence of retaliation, defendant argues, the standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) apply.  Defendant asserts, "[i]n order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) [he] participated in an activity protected by Title VII; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision."  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).[12]

### 1.    Plaintiff's Overtime Hours Retaliation Claim.

Defendant argues that plaintiff cannot establish a prima facie case of retaliation with regard to his allegation that his overtime hours were reduced because he signed Summerlin's grievance on January 13, 1999.  Defendant again asserts that plaintiff's drop in work hours (including overtime hours) coincided with three events, all occurring in December 1998, a month before plaintiff joined in the grievance.  Because each of the events that caused plaintiff's hours to drop took place before he engaged in any protected conduct, defendant contends, he cannot show that this reduction had any connection to his complaints regarding discrimination.

Defendant points to plaintiff's payroll records as evidence that the reduction and normalization of his work hours took place beginning in mid-December 1998.  By the time Plaintiff signed Summerlin's grievance on January 13, 1999, defendant argues, he was already several weeks into working 8-hour shifts and fewer overtime hours.

Defendant maintains that M&H Valve could not retaliate against plaintiff under § 1981 if

_____

[12] Defendant further argues that the fact that the adverse employment action was taken after the protected activity, standing alone, is generally insufficient to prove a causal connection to satisfy a prima facie case.  *Booth v. Birmingham News Co.,* 704 F.Supp. 213, 214 (N.D. Ala. 1988) *aff'd* 864 F.2d 793 (11th Cir. 1988).

such retaliation took place before plaintiff engaged in protected activity under that statute.  This is especially true here, defendant contends, because Martin, the M&H Valve employee who made the decisions that reduced plaintiff's hours, was completely unaware of plaintiff's January 13, 1999 grievance until after this lawsuit was filed.  Because plaintiff cannot show a nexus between his protected activity and the adverse employment action he alleges, defendant concludes, he cannot, as a matter of law, establish a prima facie case of retaliation.

Timing issues aside, defendant maintains, plaintiff has not provided any evidence to suggest that the reduction in his overall work hours had any connection to his signing the grievance or participating in any subsequent protected activity.  According to defendant, plaintiff has not identified a single statement by Martin that would suggest he posses a retaliatory animus against plaintiff.  Moreover, defendant argues, Martin was not even aware that plaintiff had joined in the grievance as the grievance originated in the Foundry and was investigated by Fulmer, not Martin.  Finally, defendant asserts, the change in plaintiff's work hours caused by the December 1998 changes simply made plaintiff's hours in 1999 and 2000 consistent with those of Raulerson, the only other utility core machine operator, and with those of the other core machine operators at M&H Valve.[13]  According to defendant, in the first five full months of 1999, plaintiff averaged 42.5 hours per week compared to Raulerson's 40.6 weekly average.

Defendant concludes that it is entitled to summary judgment on this claim because the evidence shows that plaintiff's hours were reduced before he signed the grievance and because plaintiff has failed to provide any other evidence of retaliation by Martin or anyone else at M&H

---

[13] Defendant draws the court's attention to payroll records of plaintiff, Raulerson, R. Chatman, W. Price, M. Tarver and C. Parker as evidence of this assertion.

13

Valve.

Even if plaintiff could establish a prima facie case of retaliation, defendant contends, plaintiff cannot dispute the legitimate, non-retaliatory reasons proffered by M&H Valve as to why his work schedule was changed in December 1998.  Defendants again point out that, in December 1998, Martin decided that core machine operators would begin changing their own core boxes and that utility core machine operators, such as plaintiff, would relieve the core machine operators.  Further, defendant notes, plaintiff's hours were also affected by the addition of a supervisor on the third shift and the ending of his practice of clocking into work two hours early on Sundays.  Defendant argues that it is entitled to summary judgment because plaintiff cannot assail the validity of each of these reasons for the reduction in his work hours.

### 2.    Plaintiff's Incentive Pay Retaliation Claim.

As with his overtime retaliation claim, defendant argues, plaintiff's claim related to the change in the manner in which he received incentive pay also fails as a matter of law.

According to defendant, plaintiff's receipt of what he described as "indirect incentive" pay was the result of a mistake or oversight on the part of M&H Valve.  Specifically, defendant asserts, plaintiff, who worked as an utility core machine operator before and after his incentive calculation was changed, was only supposed to receive incentive pay for the time he actually spent operating core machines.  Instead, according to defendant, plaintiff was receiving incentive pay for his entire shift (whether such shift was 8 hours or 14 hours) regardless of whether he operated a core machine on that shift.  In this regard, defendant argues, plaintiff was treated better than the other utility core machine operator on the first shift and better than the core machine operators themselves, who received incentive only while working on the core machines, not when they were performing other

tasks.

Defendant maintains that, when Martin discovered that plaintiff was unfairly receiving incentive pay for his entire shift instead of just when he was operating core machines, he did the fair thing and directed that plaintiff be paid incentive consistent with M&H Valve's policy. Defendant argues that plaintiff has presented no evidence that M&H Valve corrected his manner of receiving incentive pay for any reason other than to make his pay consistent with that of his co-workers. Furthermore, defendant states, the fact that this change was made after plaintiff signed a grievance alleging discrimination is not enough, standing alone, to allow this claim to survive summary judgment. *Booth v. Birmingham News Co.,* 704 F.Supp. 213, 214 (N.D. Ala. 1988) *aff'd* 864 F.2d 793 (11th Cir. 1988).

## II.    <u>Plaintiff's Response</u>.

Plaintiff notes that "a plaintiff alleging a retaliation claim under Title VII [and § 1981 claims] must begin by establishing a prima facie case; the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Coutu v. Martin County Bd. of County Com'rs,* 47 F.3d 1068, 1074 (11th Cir. 1995). The Eleventh Circuit "has interpreted the causal link requirement broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Id.* (quoting *E.E.O.C v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)). Plaintiff contends that he has complained about defendant's mistreatment of him through union grievances since 1999. As a result, plaintiff argues, his overtime and incentive pay have been taken away. Further, plaintiff asserts, defendant has not considered him for promotion opportunities. Plaintiff also points out that in *Reeves v.*

*Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court asserted that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148.  Plaintiff contends that he has made such a showing and , therefore, defendant's Supplemental Motion for Summary Judgement should be denied.

Regarding his claims concerning incentive pay, plaintiff argues that the incentive pay for core room employees was changed based on arbitrary criteria.  Further, plaintiff argues that the change in incentive pay affected the core machine operators in the foundry department and that most of these employees were African-American.  Plaintiff highlights Martin's testimony that in November of 2000 there were approximately 75 to 80 employees in the foundry department at M&H Valve and that, of those, perhaps 50 were black.  (Martin Depo., p. 93).  Plaintiff also points out that Martin, who was identified in Hubbard's EEOC charge as a decision maker, was the person who decided to decrease the incentive pay.

Regarding his claim that defendant prevented him from working overtime, plaintiff asserts that he was not given overtime work after his E.E.O.C. charge.  According to plaintiff, he transferred from the core room to the machine shop in 2003.  Plaintiff points to his following deposition testimony concerning the overtime given to him while in the core room as compared to that given his replacement:

> A:   Well, I have to explain what I'm saying.  All right.  The job that I was on, the core box – the machine operator –
> Q:   Right.
> A:   Okay. – as long as I was on that job, I wasn't allowed to work no overtime very seldom.  All right.  And now that I came off the job, and the man that's behind me now is working ten hours a day sometimes six days a week.

16

(Hubbard Depo., p. 74).  Plaintiff further notes that Baldwin testified that M&H Valve department

supervisors decide which employees work overtime.  (Baldwin Depo., p. 68).

In his Response, plaintiff further asserts that, in 1999, afer filing a union grievance based on

racial discrimination, he was disciplined for an infraction that was less serious than that committed

by a white employee who was not disciplined.  Plaintiff points to his following deposition testimony:

> A:   . . . It was on the core box changer job that I had did, and I got wrote up, and
> later that some of the employees that was white did the same thing that I had
> did or worser, and they wasn't wrote up, and that's what inspired the
> discrimination.
> Q:   So you were given discipline for your job performance in 1999, and other
> similarly situated white employees –
> A:   – wasn't.
> Q:   They had done the same or a similar thing, and they weren't?
> A:   Yes.

(Hubbard Depo., pp. 45-46).  According to plaintiff, after he filed another union grievance for

wrongful discipline, defendant retracted the discipline.

As further evidence of retaliation, plaintiff argues that defendant did not discipline first shift

supervisor Wayne Gill ("Gill"), a white male, for allegedly making a racially derogatory remark

about black employees to Stephen Caruso ("Caruso"), a white core machine operator.  Hubbard filed

a union grievance in response to this remark, and Caruso signed a detailed written statement

recounting his conversation with Gill.  According to Caruso's statement, Gill stated that the only

reason some employees had filed a grievance concerning the lowering of incentive pay in the core

room was because they were black.  Martin testified that he reached the conclusion that Caruso's

statement was a misquote or a misinterpretation of Gill's words.  (Martin Depo., p. 105).  Gill was

not disciplined.  Plaintiff acknowledges that the fact that Gill wasn't disciplined does not constitute

retaliation against himself.  However, plaintiff argues, Gill's racist statement and freedom from

17

punishment do lend support to his claims of retaliation.

**III.   Defendant's Reply.**

According to defendant, the evidence in this case supports its arguments for summary judgment.  Defendant argues that it has produced evidence to show that the events that caused plaintiff's change in incentive compensation and the reduction in his overtime hours took place more than four years before plaintiff filed this lawsuit.  Further, defendant claims, it has presented payroll records showing that plaintiff received hours virtually identical to similarly-situated employees, both black and white.  Defendant asserts that, in his Response, plaintiff did not even attempt to dispute any of the evidence showing the untimeliness and factual infirmity of his retaliation claims.

Defendant further argues that plaintiff's Response misrepresents the facts on the record.  For example, defendant notes that plaintiff argues that the change in incentive pay underlying his retaliation claim took place in June 2001, when M&H Valve changed the incentive rates for every core machine operator, black and white.  According to defendant, this change in policy cannot support plaintiff's retaliation claim.  Moreover, defendant asserts, this claim ignores the fact that plaintiff's counsel stated in the January 18, 2005 hearing that the change in pay retaliation claim was based on actions taken between 1998, when plaintiff made approximately $67,000 per year, and 1999, when plaintiff made $36,000.  Defendant maintains that it has given a nondiscriminatory explanation for this change.

Defendant also disputes plaintiff's claim that he has not been allowed to work overtime since the filing of his E.E.O.C. charge.  Defendant asserts that the handwritten listing of plaintiff's hours attached to Elliott's declaration show two things: (1) his noticeable decrease in hours took place in December 1998, more than a year before he filed his EEOC charge on May 1, 2001; and (2) he

18

worked overtime as often in the weeks following his charge as he did in the year-and-a-half preceding his charge.  Defendant also addresses plaintiff's claim that the employee who replaced him in the core room was given up to 60 hours of work a week, while he had been given little overtime in that position.  Defendant asserts that the hours of the other core machine operators on plaintiff's shift were attached to Elliott's declaration and show that those employees were working the same number of hours as plaintiff.

Finally, defendant discusses plaintiff's claims concerning Gill's alleged racist remark and freedom from discipline.  Defendant argues that Gill was not a decision-maker with regard to any of the actions challenged by plaintiff in connection with his retaliation claims.  Further, defendant contends, there is no evidence that Gill was ever accused of making a racial slur toward plaintiff or anyone else.  According to defendant, nowhere in Caruso's written statement does he accuse Gill of making a racial slur.  In conclusion, defendant argues, plaintiff's assertions regarding Gill cannot support his claims of retaliation in this case.[14]

### CONCLUSIONS OF COURT

The court concludes that plaintiff's retaliation claims fail for one or more of several reasons.

(1) The substantial evidence is that the overtime and incentive matters that plaintiff complains of resulted from decisions made more than four years prior to the filing of this action.[15]

---

[14] Defendant asks that the court order plaintiff to reimburse M&H Valve for the costs and attorneys' fees associated with its defense against these retaliation claims.

[15] This results in a statutory bar as to the § 1981 claims.  Any purported Title VII retaliation claims would clearly be barred.

19

(2) If the court accepts the plaintiff's argument that the pay decreases occurred on June 5, 2001, there would clearly be no causal relationship with a grievance which was filed in early 1999.[16]

(3) The substantial evidence creates a reasonable inference that the 1999 grievance came as a result of the actions taken in December 1998 of which the plaintiff complains.  There obviously could not be retaliation in 1998 for a grievance filed in 1999.

(4) The defendant has articulated nondiscriminatory reasons for its actions.  Plaintiff has not rebutted these reasons with any substantial evidence.

(5) There is no substantial evidence that similarly situated white employees were treated more favorably than plaintiff.

It may be understandable why the purported retaliation claims lack merit.  They were raised for the first time in this lawsuit, well after the E.E.O.C. charge was filed on May 1, 2001 even though the purported acts of retaliation had taken place before the filing of that charge. *Compare Cooper v. Southern Co.,* 390 F.3d 695 (11th Cir. 2004).

The motion will be granted.

This 3rd of March, 2005.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[16] Plaintiff has suggested that there was retaliation in June 2001 based on his May 1, 2001 individual E.E.O.C. charge.  The substantial evidence, however, is that the incentive rates change at that time was across the board for all operators, not something directed at plaintiff.

20